**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
(NORTHERN DIVISION)**

| | |
|---|---|
| LORA MCKAY, individually and on behalf of a class of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>LEWIS E. BEVILLE; AUGUSTUS K. CLEMENTS; ROBERT S. CRAFT; PATRICK F. DYE; HUBERT L. HARRIS, JR.; T. BRENT HICKS; PATTI G. HILL; CLINTON O. HOLDBROOKS; DEBORAH L. LINDEN; ROBERT E. LOWDER; JOHN ED MATHISON; MILTON E. MCGREGOR; SARAH H. MOORE; JOSEPH D. MUSSAFER; ANGIE S. PARKER; HARLAN C. PARRISH; WILLIAM E. POWELL, III; JAMES W. RANE; SIMUEL S. SIPPIAL, JR.; EDWARD V. WELCH, ANDREW WILSON; AND JOHN AND JANE DOES 1-25,<br><br>Defendants. | Case No.:  9-CV-806-MHT-WC<br><br>**CLASS ACTION**<br><br>**AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY ACT** |

## I.    PREFATORY NOTES

- On August 14, 2009, the Alabama State Banking Department closed Colonial Bank (the "Bank"), a wholly owned subsidiary of The Colonial BancGroup, Inc. ("Colonial" or the "Company"), and appointed the Federal Deposit Insurance Corporation ("FDIC") receiver.  Subsequently, the FDIC entered into a purchase

and assumption agreement with Branch Banking and Trust ("BB&T") to assume all deposits of the Bank.

- On August 25, 2009, Colonial filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code. This Amended Complaint reflects the fact that Plaintiff is not prosecuting this action against Colonial or the Bank.

## II.     INTRODUCTION

1.     Plaintiff Lora McKay alleges the following based upon her personal knowledge and the investigation of Plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Colonial, including the Company's proxy statements (Form DEF14A), annual reports (Form 10-K), quarterly reports (Form 10-Q), current reports (Form 8-K), and the annual reports (Form 11-K) filed on behalf of The Colonial BancGroup 401(k) Plan (the "Plan"); a review of the Forms 5500 filed by the Plan with the U.S. Department of Labor ("DOL"); interviews with participants of the Plan; and a review of available documents governing the operations of the Plan, including The Colonial BancGroup 401(k) Plan Summary Plan Description, January 1, 2002 (the "SPD"). Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## III.     NATURE OF THE ACTION

2.     This is a class action brought on behalf of the Plan, pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (a)(3), against the fiduciaries of the Plan for violations of ERISA.

3.     The Plan is a retirement plan sponsored by Colonial.

4.     Plaintiff's claims arise from the failure of Defendants, who are fiduciaries of the Plan, to act solely in the interest of the participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the period April 18, 2007 to present (the "Class Period").

5.     Defendants allowed the imprudent investment of the Plan's assets in Colonial common stock throughout the Class Period, even though they knew or should have known of and/or failed to investigate the improper business practices of the Bank.  These improper business practices included, among other things, that the Bank: (1) engaged in high-risk loan origination, mortgage warehouse lending, and investment practices; (2) lacked adequate internal and financial controls; (3) grossly mismanaged risk and liquidity; (4) engaged in improper accounting practices; and (5) did not adequately reserve for loan losses, all of which created dire financial circumstances.  Furthermore, Defendants failed to acknowledge, manage, and accurately disclose the risks associated with the Bank's mortgage loan origination, mortgage warehouse lending, and investment practices.  And Defendants issued false, misleading, and incomplete statements regarding its net income and financial results, which led to the artificial inflation of the Company's stock price.  As such, the participants were not informed of the true risks of investing their Plan assets in Colonial common stock, and, thus, could not and did not make fully informed decisions regarding such investment.

6.     Therefore, Plaintiff alleges in Count I that Defendants who were responsible for the investment of Plan assets breached their fiduciary duties to the Plan's participants in violation of ERISA by failing to prudently and loyally manage the Plan's investment in Colonial stock.  In Count II, Plaintiff alleges that Defendants who were responsible for the selection, monitoring, and removal of the Plan's other fiduciaries failed to properly monitor the performance of their

fiduciary appointees and remove and replace those whose performance was inadequate, as well as provide them with the necessary information to fulfill their fiduciary duties. In Count III, Plaintiff alleges that Defendants breached their duty to inform the Plan's participants by failing to provide complete and accurate information regarding the soundness of Colonial stock and the prudence of investing and holding retirement contributions in Colonial equity.  Finally, in Count IV, Plaintiff alleges that Defendants breached their duties and responsibilities as co-fiduciaries by failing to prevent breaches by other fiduciaries of their duties of prudent and loyal management, adequate monitoring, and complete and accurate communications to co-fiduciaries and Plan participants and beneficiaries.

7.      As is more fully explained below, during the Class Period, Defendants with responsibility for the Plan's investments imprudently permitted the Plan to hold and acquire Colonial stock despite the Company's serious mismanagement, improper business practices, and dire financial circumstances.  Based on publicly available information for the Plan, Defendants' breaches have caused an estimated principal loss of well over $50 million of retirement savings.

8.      This action is brought on behalf of the Plan and seeks to recover losses to the Plan for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2).  In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiff seeks other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, declaratory relief, and other monetary relief.

9.      ERISA §§ 409(a) and 502(a)(2) authorize participants such as Plaintiff to sue in a representative capacity for losses suffered by the Plan as a result of breaches of fiduciary duty. Pursuant to that authority, Plaintiff brings this action as a class action under Fed. R. Civ. P. 23 on

behalf of all participants and beneficiaries of the Plan whose Plan accounts were invested in Colonial stock during the Class Period.

10.    In addition, because the information and documents on which Plaintiff's claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiff's allegations are made by necessity on information and belief.  At such time as Plaintiff has had the opportunity to conduct discovery, Plaintiff will, to the extent necessary and appropriate, amend this Complaint or, if required, will seek leave to amend to add additional facts that further support Plaintiff's claims.

## IV.    JURISDICTION AND VENUE

11.    **Subject Matter Jurisdiction.**  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.    **Personal Jurisdiction.**  ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  All Defendants are either residents of the United States or subject to service in the United States.  Therefore, this Court has personal jurisdiction over them.  This Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in the State of Alabama.

13.    **Venue.**  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and Colonial has its principal place of business in this district.

## V.    PARTIES

**A.    Plaintiff**

14.    Plaintiff Lora McKay is currently a resident of Zephyr Cove, Nevada and a former employee of the Company.  She was a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), held Colonial shares in the Plan during the Class Period, and suffered a loss in her Plan account as a result.

**B.    The Colonial BancGroup, Inc.**

15.    Colonial is a financial holding company.  The Company is incorporated in Delaware and has its principal offices in Montgomery, Alabama.  The principal activity of Colonial is to supervise and coordinate the business of its subsidiaries and to provide them with capital and services.  Before the Bank failed and the Company subsequently filed for Chapter 11 protection, the Company derived substantially all of its income from dividends received from the Bank.  As of December 31, 2008, the Bank accounted for approximately 99.3% of Colonial's consolidated assets.  Colonial Annual Report at 1, Form 10-K, Dec. 31, 2008.

16.    The Bank conducted a general commercial banking business and offered a variety of demand, savings, and time deposit products as well as extensions of credit through personal, commercial, and mortgage loans within each of its market areas.  The Bank also provided wealth management services, electronic banking services, and credit card services.  The Bank's subsidiaries, Colonial Investment Services, Inc. and Colonial Investment Services of Florida, Georgia, Nevada and Tennessee, also offered various insurance products and annuities for sale to the public.

17.    Neither Colonial nor the Bank are named Defendants, and Plaintiff is not asserting claims against or seeking relief from Colonial or the Bank through this action.

C.    **Defendants**

18.    The Defendants are identified below.  All of the Defendants were fiduciaries of the Plan within the meaning of ERISA, as is explained below in Section VI ("Defendants' Fiduciary Status"), and all of them breached their fiduciary duties in various ways as is explained in Section XI ("Causes of Action").

19.    **Director Defendants.**  As explained in more detail below, the Colonial Board of Directors, some of which were also the Bank's Board of Directors, had certain responsibilities with respect to the Plan, including appointment and oversight responsibilities.  The Defendants identified in this paragraph are referred to as the "Director Defendants."  The Director Defendants during the Class Period were as follows:

(1)    **Defendant Lewis E. Beville** has served as a Director of the Company since 1997.  Effective June 3, 2009, Defendant Beville was appointed the Chief Executive Officer and President of the Company and of the Bank;

(2)    **Defendant Augustus K. Clements, III** has served as a Director of the Company since 1997 and is a Director of the Bank;

(3)    **Defendant Robert S. Craft** has served as a Director of the Company since 1992;

(4)    **Defendant Patrick F. Dye** has served as a Director of the Company since 1981;

(5)    **Defendant Hubert L. Harris, Jr.** has served as a Director of the Company since 2004;

(6)    **Defendant Clinton O. Holdbrooks** has served as a Director of the Company since 1986.  Defendant Holdbrooks was also appointed to the Board of the Bank in June 2009;

(7)     **Defendant Deborah L. Linden** served as a Director of the Company from 2006 until her resignation from the Board on November 25, 2008. Defendant Linden also serves as member of the Bank's Regional Board of Directors for the Central Florida Region;

(8)     **Defendant Robert E. Lowder** served as a Director of the Company from 1981 until his retirement effective June 3, 2009. Defendant Lowder also served as Chairman of the Board and was the Company's Chief Executive Officer and President until his retirement. Defendant Lowder also served as the Chairman of the Board of the Bank and was the Bank's Chief Executive Officer and President until his retirement.

(9)     **Defendant John Ed Mathison** has served as a Director of the Company since 1987. Defendant Mathison was also appointed to the Board of the Bank in June 2009;

(10)    **Defendant Milton E. McGregor** has served as a Director of the Company since 1983;

(11)    **Defendant Joseph D. Mussafer** has served as a Director of the Company since 1981;

(12)    **Defendant William E. Powell, III** has served as a Director of the Company since 1987. Defendant Powell also serves as a Director of the Bank;

(13)    **Defendant James W. Rane** has served as a Director of the Company since 1997;

(14)    **Defendant Simuel S. Sippial, Jr.** has served as a Director of the Company since 1997 and was appointed as Chairman of the Board effective June 3, 2009.  Defendant Sippial also serves as a Director of the Bank and was appointed as Chairman of the Bank's Board effective June 3, 2009; and

(15)    **Defendant Edward V. Welch** served as a Director of the Company from 1981 until his mandatory retirement from the Board effective April 15, 2009.

20.    **Benefits Administration and Investment Committee Defendants.**  As explained in more detail below, the Director Defendants delegated certain fiduciary responsibilities and duties to the members of the Benefits Administration and Investment Committee ("Benefits Committee").  For at least part of the Class Period, effective April 15, 2009, the Benefits Committee was the Plan Administrator of the Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), and had full authority and power to administer and construe the Plan.  Resolution of the Board of Directors of the Colonial BancGroup, Inc. Delegating Authority to the Benefits Administration and Investment Committee, April 15, 2009 ("Board Resolution"), ERISA 0227-0228.  On information and belief, the Benefits Committee also had certain fiduciary responsibilities and duties with respect to the Plan's investment policies.  The Benefits Committee and its members were therefore fiduciaries of the Plan.  The Defendants identified in this paragraph are referred to as the "Benefits Committee Defendants." On information and belief, some of the Benefits Committee Defendants during the Class Period were as follows:

(1)    **Defendant Patti G. Hill**, served as Senior Executive Vice President and Chief Operating Officer, at Colonial and the Bank from 2004 until August 25, 2009;

(2)    **Defendant Sarah H. Moore**, has served as Senior Executive Vice President and Chief Financial Officer, at Colonial and the Bank since July 2005;

(3)    **Defendant T. Brent Hicks**, has served as Chief Accounting Officer and Senior Vice President at Colonial since March 2006;

(4)    **Defendant Angie S. Parker**, has served as Chief Human Resources Officer at Colonial and the Bank since May 19, 2009;

(5)    **Defendant Andrew Wilson**, served as Compensation and Benefits Director during the Class Period; and

(6)    **Defendant Harlan C. Parrish**, has served as Senior Executive Vice President — Retail Banking and Lines of Business Director, Colonial and the Bank, since February 24, 2009.

21.    Plaintiff does not currently know the identity of the remaining Benefits Committee members who served during the Class Period, which may include the Chief Administration Officer and Corporate Treasurer. *See* Board Resolution at ERISA 0227. Therefore, the remaining Benefits Committee members are named fictitiously, as Benefits Committee John and Jane Does 1-10. Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

22.    **Investment Committee Defendants.** As explained in more detail below, the Investment Committee had certain responsibilities with respect to the Plan, including

10

promulgating the Plan's investment policies and directing the Trustee in selecting the underlying investments for the Plan.[1]  SPD at "Basic Plan Information."  The Investment Committee and its members were therefore fiduciaries of the Plan.  The Defendants identified in this paragraph are referred to as the "Investment Committee Defendants."

23.    Plaintiff does not currently know the identity of the Investment Committee members who served during the Class Period.  Therefore, the Investment Committee members are named fictitiously, as Investment Committee John and Jane Does 12-20.  Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

24.    **Administrative Committee Defendants.**  As explained in more detail below, the Plan assigned certain fiduciary responsibilities and duties to the Administrative Committee. Until April 15, 2009, the Administrative Committee was the Plan Administrator of the Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), and had full authority and power to administer and construe the Plan.  SPD at "Basic Information"; SPD at "Claims Procedures."  The Administrative Committee and its members were therefore fiduciaries of the Plan.  The Defendants identified in this paragraph are referred to as the "Administrative Committee Defendants."

25.    Plaintiff does not currently know the identity of the Administrative Committee members during the Class Period.  Therefore, the Administrative Committee members are named fictitiously, as Administrative Committee John and Jane Does 21-25.  Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

---

[1]  At this time, Plaintiff is unable to ascertain whether the Benefits Committee replaced the Investment Committee on April 15, 2009, or assumed any of the Investment Committee's fiduciary duties or general responsibilities.  Once Plaintiff determines the extent of the Benefits Committee's role with respect to the Plan and the effect of its establishment on the Investment and Administrative Committees, Plaintiff will seek leave to amend the complaint.

## VI.    DEFENDANTS' FIDUCIARY STATUS

### A.    Types of ERISA Fiduciary Status

26.    Named Fiduciaries.  ERISA requires every plan to have one or more "named fiduciaries."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

27.    *De Facto* or Functional Fiduciaries.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who in fact perform fiduciary functions.  *See* ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).  Such fiduciaries are referred to herein as "*de facto*" or "functional" fiduciaries.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."  *Id.*

28.    Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and the participants in the manner and to the extent set forth in the Plan's governing instruments, under ERISA, and through their conduct.

29.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under

the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

30.    Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the fiduciary discretion and authority assigned to and/or exercised by each of them, and the claims against each Defendant are based on such specific discretion and authority.

31.    Instead of delegating all fiduciary responsibility for the Plan to external service providers, on information and belief, Colonial chose to delegate its responsibility regarding the administration of the Plan initially to the Administrative Committee and then to the Benefits Committee.  Additionally, Colonial chose to assign the appointment and removal of fiduciaries to the Colonial Board of Directors.

32.    ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions.  ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3).  However, insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

**B.    The Director Defendants' Fiduciary Status Under the Plan**

33.    During the Class Period, the Director Defendants were named fiduciaries of the Plan and appointed the members of the Administrative Committee, the Investment Committee, and the Benefits Committee.  The Colonial BancGroup 401(k) Plan (as amended and restated effective January 1, 2002) (defining "Named Fiduciary" to include the Colonial Board of Directors and appointing members to the Administrative and Investment Committees), January 2008 ("Plan Document"), ERISA 0014-0113, at ERISA 0035, 0094, 0097; Board Resolution at ERISA 00227 (appointing members to the Benefits Committee).

34.    Pursuant to the Plan Document, the Colonial Board of Directors had the following duties and responsibilities:

(1)    to appoint the Administrative Committee, the Investment Committee and to monitor each of their performances;

(2)    to communicate such information to the Administrative Committee and the Investment Committee as each needs for the proper performance of its duties;

(3)    to provide channels and mechanisms through which the Administrative Committee can communicate with Participants and Beneficiaries; and

(4)    to terminate the Plan.

Plan Document at ERISA 0097-0098.

35.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Director Defendants were both named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) and *de facto* fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**C.    The Benefits Committee Defendants' Fiduciary Status Under the Plan**

36.    Effective April 15, 2009, the Benefits Committee served as the Plan Administrator.  Board Resolution at ERISA 0227-0228.  Per the Board Resolution, the Benefits Committee was appointed "to serve as the Administrator of all Benefit Plans offered by the Corporation, pursuant to the applicable Sections of each Plan, and having all the powers, duties and responsibilities allocated to the Administrator under the Plan(s)."  *Id.* at ERISA 0228.

Therefore, on information and belief, the Benefits Committee assumed the "administrator" duties previously held by the Administrative Committee, including those detailed below in Paragraph 41.

37.     Furthermore, on information and belief, on April 15, 2009, the Benefits Committee assumed certain Plan investment duties held by the Investment Committee.  *See generally*, Board Resolution at ERISA 0227.

38.     Consequently, in light of the foregoing duties, responsibilities, and actions, the Benefits Committee Defendants were *de facto* fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan

**D.     The Investment Committee Defendants' Fiduciary Status Under the Plan**

39.     Under the Plan Document, the Investment Committee Defendants were the "Named Fiduciary to act on behalf of the Controlling Company to establish and carry out a funding policy consistent with the Plan objectives and with the requirements of any applicable law."  Plan Document at ERISA 0096; *see also* Plan Document at ERISA 0035 (defining "Named Fiduciary" to include the Investment Committee).

40.     The Investment Committee Defendants were responsible for promulgating the Plan's investment policies and directing the Trustee in selecting the underlying investments for the Plan.  SPD at "Basic Plan Information"; SPD at "Investments."  On information and belief, the responsibility of directing the Trustee with respect to the investments in the Plan would also include the duty to monitor the performance of the Plan investment funds, including the Colonial Stock Fund, which is primarily invested in Company common stock, and direct the removal of

funds as necessary.  Additionally, the Investment Committee was responsible for carrying out the

Company's responsibility and authority with respect to the following:

(1)     to appoint one or more persons to serve as investment manager with respect to all or part of the Plan assets, including assets maintained under separate accounts of an insurance company;

(2)     to allocate the responsibility and authority being carried out by the Investment Committee among the members of the Committee;

(3)     to take any action appropriate to ensure that the Plan assets are invested for the exclusive purpose of providing benefits to Participants and their Beneficiaries in accordance with the Plan and defraying reasonable expenses of administering the Plan, subject to the requirements of any applicable law; and

(4)     to employ one or more persons to render advice with respect to any responsibility or authority being carried out by the Investment Committee. To the extent that the costs for such assistants and advisors are not paid by the Controlling Company, they shall be paid at the direction of the Investment Committee from the Trust Fund as an expense of the Trust Fund.

Plan Document at ERISA 0096-0097.

41.     Consequently, in light of the foregoing duties, responsibilities, and actions, the

Investment Committee Defendants were both named fiduciaries of the Plan pursuant to ERISA §

402(a)(1), 29 U.S.C. § 1102(a)(1) and *de facto* fiduciaries of the Plan within the meaning of

ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised

discretionary authority or discretionary control respecting management of the Plan, exercised

authority or control respecting management or disposition of the Plan's assets, and/or had

discretionary authority or discretionary responsibility in the administration of the Plan.

**E.     The Administrative Committee Defendants' Fiduciary Status Under the Plan**

42.     Under the Plan Document, the Administrative Committee Defendants were named

fiduciaries of the Plan and served as the Plan Administrator for at least part of the Class Period.

Plan Document at ERISA 0022, 0035, 0098.  Per the Plan Document, to fulfill its duties as the

"administrator," the Administrative Committee has the following duties and responsibilities:

(a)    to construe the Plan and to determine all questions that shall arise
thereunder;

(b)    to have all powers elsewhere herein conferred upon it;

(c)    to decide all questions relating to the eligibility of Employees to
participate in the benefits of the Plan;

(d)    to determine the benefits of the Plan to which any Participant or
Beneficiary may be entitled;

(e)    to maintain and retain records relating to Participants and Beneficiaries;

(f)    to prepare and furnish to Participants all information required under
federal law or provisions of the Plan to be furnished to them;

(g)    to prepare and furnish to the Trustee sufficient employee data and the
amount of Contributions received from all sources so that the Trustee may
maintain separate accounts for Participants and Beneficiaries and make
required payments of benefits;

(h)    to prepare and file or publish with the Secretary of Labor, the Secretary of
the Treasury, their delegates and all other appropriate government officials
all reports and other information required under law to be so filed or
published;

(i)    to provide directions to the Trustee with respect to methods of benefit
payment, and all other matters where called for in the Plan or requested by
the Trustee;

(j)    to engage assistants and professional advisers;

(k)    to arrange for fiduciary bonding;

(l)    to provide procedures for determination of claims for benefits;

(m)    to designate, from time to time, the Trustee;

(n)    to amend the Plan at any time and from time to time as provided for in
Article XIII; and

(o)    to delegate any recordkeeping or other administrative duties hereunder to
another person or third-party; all as further set forth herein.

Plan Document at ERISA 0093-0094.

43.     Therefore, in order to comply with ERISA, the Administrative Committee exercised responsibility for communicating with participants regarding the Plan in a plan-wide, uniform, mandatory manner by providing participants with information and materials required by ERISA. *See, e.g.*, ERISA § 101(a)(1), 29 U.S.C. § 1101(a)(1) (requiring the plan administrator to furnish to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan a summary plan description).  .

44.     Consequently, in light of the foregoing duties, responsibilities, and actions, the Administrative Committee Defendants were both named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) and *de facto* fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

## VII.     THE PLAN

### A.     The Purpose and Operation of the Plan

45.     The Plan, sponsored by Colonial, is a defined contribution plan and a purported Employee Stock Ownership Plan ("ESOP") that is designed to help employees "look to the future" in preparation of their retirement years.  SPD at "Your Plan."  The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).  However, in a breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff.  Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

46.     The Plan, established effective October 1, 1983, provides retirement benefits for nearly all of Colonial's employees, barring some limited exclusions.  SPD at "Eligibility." Effective April 1, 2005, an employee who works at least 20 hours per week is eligible to participate in the Plan upon their date of hire.  2008 Form 11-K at 4.  Employees who work less than 20 hours a week are eligible to participate upon the completion of one year of service.  *Id.*

47.     The assets of an employee benefit plan, such as the Plan here, must be "held in trust by one or more trustees."  ERISA § 403(a), 29 U.S.C. § 1103(a).  During the Class Period, the assets of the Plan were held in trust by The Charles Schwab Trust Co.  SPD at "Basic Plan Information."  Milliman USA, Inc. serves as the recordkeeper for the Plan. 2008 Form 11-K at 4.

**B.     Participant and Employer Contributions to the Plan**

48.     Under the Plan, a participant's before-tax, catch-up, rollover, and matching contributions are allocated to the ESOP portion of the Plan.  During the following year the portion of the participant's account that is not invested in Company stock as of the preceding December 31 will be transferred to the non-ESOP portion of the Plan.  SPD at "When are Contributions Allocated to My Account?"

49.     Participants can elect to contribute up to 70% of their annual eligible compensation on a pre-tax basis, up to the maximum allowable by the Internal Revenue Code. 2008 Form 11-K at 4.  For 2008, the maximum employee contribution, excluding catch-up contribution provisions, was $15,500.  *Id.*  The maximum catch-up contribution for those 50 year or older was $5,000 for 2008.  *Id.*

50.     Effective January 1, 2007, the Company made employer matching contributions equal to 100% of the participant's contribution, limited to a maximum of 6% of the participant's compensation.  *Id.*  Effective April 1, 2009, Colonial suspended the employer matching contributions provided under the Plan.  *Id.* at 10.

51.    Participants' salary reductions are fully vested and non-forfeitable at all times. 2008 Form 11-K at 6.  Participants become vested in the Company matching and discretionary contributions according to the following schedule:

| Years of Service | Vested Percentage |
|---|---|
| Less than 1 year | 0% |
| 1 year | 20% |
| 2 years | 40% |
| 3 years | 60% |
| 4 years | 80% |
| 5 years or more | 100% |

*Id.* at 6.

52.    Participants direct the investment of both salary reduction contributions and Company contributions into the various investment options offered by the Plan.  *Id.* at 4.

**C.    Investment Options in the Plan, Including Colonial Stock Fund**

53.    The Colonial Stock Fund holds the Plan's shares of Colonial common stock. According to the SPD, the Colonial Stock Fund was designed to invest primarily, *i.e.*, not exclusively, in Colonial stock.  SPD at "Investments."

54.    On information and belief, throughout the Class Period, the Investment Committee Defendants directed the Trustee in the selection of the investments in the Plan and the investment policies.  SPD at "Basic Plan Information"; SPD at "Investments."

55.    Accordingly, the Investment Committee had the authority and responsibility to halt further investments in Colonial stock, require that Plan participants transfer their investments held in the Colonial Stock Fund to another Plan investment option, and the authority and responsibility to liquidate those investments, once it became imprudent to remain invested in Colonial stock or in the Colonial Stock Fund to the extent that it was comprised of Company stock.

**D.     The Plan's ESOP Status**

56.     In addition to being an "employee pension benefit plan," as defined by ERISA §

3(2)(A), 29 U.S.C. § 1002(2)(A), as noted above, the Plan purports to be an ESOP.  An ESOP is

an ERISA plan that invests primarily in "qualifying employer securities."  29 U.S.C. §

1107(d)(6)(A).  For a plan to qualify as an ESOP, the plan must meet numerous requirements set

forth in both ERISA and the Internal Revenue Code.  Based on documents reviewed to date, it is

not readily apparent that the Plan qualifies as an ESOP, since it does not appear that the ESOP

portion of the Plan was "designed to invest primarily in qualifying employer securities."  Even if

the Plan qualifies as an ESOP, Plan fiduciaries may not invest in employer securities regardless

of the circumstances.  On the contrary, while the duty to diversify does not apply to company

stock investments per se in an ESOP, the fiduciaries remain bound by the other core ERISA

fiduciaries duties, including the duties to act loyally, prudently, and for the exclusive purpose of

providing benefits to plan participants.

**E.     Losses to the Plan**

57.     During the Class Period, Colonial stock represented a significant portion of the

Plan's net assets.  As a result, the Plan incurred substantial losses when the stock plummeted.

On April 18, 2007, Colonial stock closed at $24.85 per share, and, on information and belief, the

value of the Company stock held in the Plan as of that date was valued at over $40 million.  *See*

2007 Form 11-K at 9.  As of August 21, 2009—following the collapse of the Company due to

the revelations that the Company engaged in, among other things, fraudulent loan origination and

extremely risky investment practices—Colonial stock is trading under ticker CBCG.PK at

approximately $0.07 per share, representing a decline of nearly 99.7% since the beginning of the

Class Period, and signifying huge Plan losses.  On information and belief, the value of Colonial

stock in the Plan is now only worth approximately $1.5 million.

21

58.     Despite the Plan's substantial investment in Colonial stock, Defendants failed to protect the Plan from the risks that the Company's reckless and improper conduct created. Defendants continued to hold the Plan's shares of Colonial stock and compounded the problem (and the losses) by continuing to offer Company stock as a Plan investment option, and allow participants to purchase additional shares during the Class Period.  Plaintiff estimates, based on purchaser and holder losses during the Class Period, a principal Plan loss of well over **$50 million**.

## VIII.    FACTS BEARING ON FIDUCIARY BREACH

**A.    Colonial Stock was an Imprudent Investment for the Plan during the Class Period Because of Improper Business Practices and Risk Mismanagement that Resulted in the Precipitous Decline in the Company's Stock Price.**

59.     During the Class Period, Colonial stock became an imprudent investment for Plan participants' retirement savings.  The Bank was financially mismanaged, and it engaged in highly risky and inappropriate loan origination practices, creating dire financial circumstances that exposed the Plan to the risk of huge losses.

60.     A fiduciary may not ignore circumstances, such as those here, that increase the risk of loss to participants and beneficiaries to an imprudent and unacceptable level.

61.     Defendants' incomplete and inaccurate statements contributed to the artificial inflation of the value of the Company stock, creating and increasing the risk of loss.  As the DOL, the agency charged with responsibility for enforcing ERISA, has stated, it is never prudent for a retirement plan fiduciary to purchase company stock that he knows or should know is artificially inflated.  Brief of the Secretary of Labor as Amicus Curie Supporting Appellants and Requesting Reversal at 15-16, *In re Calpine Corp. ERISA Litig.*, No. 06-15013 (9th Cir. Nov. 16, 2006).

62.     A variety of circumstances contributed to the unacceptable level of risk borne by Plan participants as a result of the Plan's investment in Colonial stock, including, but not limited to the failure of Defendants to investigate the improper business practices of the Company's principal operating subsidiary, Colonial Bank.  These improper business practices created dire financial circumstances and included, among things, that the Bank:

      (1)     engaged in highly risky loan origination, mortgage warehouse lending, and investment practices;

      (2)     lacked adequate internal and financial controls;

      (3)     mismanaged risk and liquidity;

      (4)     engaged in improper accounting practices; and

      (5)     did not adequately reserve for loan losses.

63.     Furthermore, Defendants failed to acknowledge, manage, and accurately disclose the risks associated with the Bank's mortgage loan origination, mortgage warehouse lending, and investment practices.  And Defendants issued false, misleading, and incomplete statements regarding its net income and financial results, which served to artificially inflate the Company's stock price.

64.     Given the purpose of the Plan—to allow employees to save for retirement—the Plan's fiduciaries did not undertake any meaningful action to protect the Plan from the losses caused by the Plan holding a significant amount of Colonial stock during the Class Period.  The Plan's fiduciaries continued to offer Colonial stock as an investment option and maintain Colonial shares in the Plan even as the stock was plunging in value.  A prudent fiduciary facing similar circumstances would not have stood idly by as the Plan lost millions of dollars.

1.    **Background**

65.    During the recent housing boom, interest rates were low, leading to reduced mortgage rates, which attracted more first-time home buyers and persuaded many to refinance their existing loans.  Lenders took advantage of this growing market by originating an increasing number of loans and lowering underwriting standards to capture a broader base of borrowers.  Many lenders lowered the minimum credit score borrowers needed to qualify for certain loans and allowed borrowers to finance a greater percentage of their home's value.  *See* Ruth Simon, *Mortgage Lenders Loosen Standards – Despite Growing Concerns, Banks Keep Relaxing Credit-Score, Income and Debt-Load Rules*, Wall St. J., July 26, 2005, at D1.

66.    Consequently, in late 2004 and early 2005, industry watchdogs began expressing growing fears that relaxed lending practices had increased "risks for borrowers and lenders in the overheated housing markets."  *Id.*

67.    Trouble in the housing market emerged in 2005 when home values began to decline and the Federal Reserve instituted a series of interest rate hikes.  In response, "bank regulators issued their first-ever guidelines for credit-risk management for home-equity lending" in May 2005.  *Id.*

68.    In October 2005, the FDIC expressed heightened concerns over the housing boom and worry over falling lending standards.  FDIC Chairman Don Powell stated in a press release at the time that "the U.S. has experienced a 5-year housing boom capped by record home-price growth since 2004," and warned that "we know that housing booms don't last forever."  FDIC, *Time of Transition to Follow Record-Setting Housing Boom, Powell Cautions*, Press Release, Oct. 18, 2005.

69.    By the end of that year, the housing bubble had burst, and housing prices started to decline for the first time in decades.

    2.    **Colonial Bank Continues to Grow Its Loan Portfolio Even as the Housing Market Contracts and the Mortgage Crisis Unfolds.**

70.    In the midst of the recent real estate market downturn, the Bank continued to grow its loan portfolio, originating more and more loans, and even expanding into Florida—a once hot market that began to steeply decline in 2006.  Indeed, on January 24, 2007, the Bank acquired Miami-based Commercial Bankshares, the holding company for Commercial Bank of Florida, whose loan portfolio focused primarily on real estate mortgages.  *Colonial BancGroup to Acquire Commercial Bankshares for 5.94 Times Revenue*, Weekly Corporate Growth Report, Jan. 29, 2007, http://findarticles.com/p/articles/mi_qa3755/is_200701/ai_n17220748/.

71.    Despite Florida's plummeting housing prices, Defendant Lowder described the acquisition as a success, enabling Colonial to boost the Bank's presence "in one of Florida's wealthiest and most dynamic growth markets."  Jane Bussey, *Colonial BancGroup to Purchase Commercial Bankshares*, Miami Herald, Jan. 24, 2007.

72.    Although the Bank represented itself as a conservative, prudent risk taker, with its multiple acquisitions in Florida and other troubled real estate markets, Colonial became a significant player in high risk regions, as was evidenced "with 69% of its assets in Florida, Nevada and Texas."  Karen Richardson & Valerie Bauerlein, *Shaky Construction Market Expose Midsize Banks – Weakness in Florida May Weigh on Colonial BancGroup's Loan Portfolio*, Wall St. J., Mar. 22, 2007.

73.    Additionally, the Bank continued to grow its portfolio of real estate construction, land, and development ("CLD") loans.  While CLD loans constituted, on average, 15% of those loans held by national banks, 41% of the loans held Colonial Bank's loan portfolio were CLD loans.  *Id.*  In 2006 alone, the Bank's "[r]eal-estate construction loans grew 61%," predominantly in Florida.  *Id.*

74.    Indeed, the Bank "lent far more to construction borrowers as a percentage of its so-called core capital [in 2006] than recommended by the Federal Deposit Insurance Corp. guidelines." *Id*. "Colonial [Bank]'s construction-lending ratio [was] 413% of core capital . . . compared with the FDIC's minimum threshold guideline of 100%." *Id*.

75.    Colonial continued to expand into the Florida region, announcing in July 2007 that it would acquire Florida based Citrus & Chemical Bancorporation. *Colonial BancGroup 2Q Earnings Show Little Change from 2006*, A.P., July 18, 2007.

76.    Throughout this period, the Company touted the Bank's "stringent underwriting standards," "prudent management of credit risks," and assured the market that it did not engage in subprime lending. Colonial Current Report, Form 8-K, July 18, 2007, at Ex. 99.1.

**3.    The Company Begins to Show Signs of Distress.**

77.    As the mortgage crisis continued, the rate of delinquencies in the Bank's loan portfolio began to significantly increase. Additionally, the secondary market—which provided liquidity to the mortgage market by buying loans from lenders—began to evaporate in 2007. Colonial Bank was one of the nation's largest providers of warehouse lines of credit to mortgage brokers and independent, non-depository mortgage banks. James R. Hagerty & Lingling Wei, *Taylor Bean Suspended from Making FHA Loans*, Wall St. J., Aug. 5, 2009. Much of the Bank's capital for warehouse lending, however, was derived from selling these warehouse loans to the secondary market. With the freezing of the secondary market, the Bank was forced to move approximately $1.5 billion in mortgage warehouse assets to its balance sheet during the first quarter of 2008. *See* Colonial Quarterly Report at 4, Form 10-Q, Mar. 31, 2008.

78.    Colonial's earnings deteriorated throughout 2007 and 2008, primarily due to the deterioration in its loan portfolio. Nonetheless, Defendant Lowder brushed off any concerns and reassured the public and Plan participants that "Colonial is well positioned to handle the

continued weakness in the housing sector."  Colonial Current Report, Form 8-K, Jan. 23, 2008, at Ex. 99.1.

79.    Lowder also touted the Bank's prudent business practices, stating that it "tightened [its] underwriting standards considerably," and that it had "no subprime exposure" and "stopped lending in the riskiest condo-building areas well before these sweeping developments."  *Id.*

80.    On February 2, 2008, Colonial was cut to a sell rating by a stock analyst at Stifel Nicolaus.

81.    Mid-sized regional banks, such as Colonial, were entrenched in losses related to the housing crisis.  Morgan Stanley took note of this in its analyst report on April 1, 2008, holding a "cautious" view of the sector.  Ratul Ray Chaudhuri, *Morgan Stanley Cautious on US Mid-Sized Banks*, Reuters, Apr. 1, 2008.  Morgan Stanley placed Colonial on its list of "highest conviction "underweight" stocks", saying it expected "significant near-term credit deterioration in construction," a primary area for Colonial.  *Id.*

82.    Colonial's first-quarter 2008 performance was well below the stock analyst consensus estimate.  Nonetheless, Colonial looked at its earnings as evidence of its strength.  Lowder stated that the Company's "continued profitability is evidence of [its] ability to deal with a difficult credit environment," and emphasized that "to date, [the Company had] not seen significant declining credit quality trends" in its loan portfolios, that it had "systemically identified and isolated problematic credits," and had "dedicated highly experienced, skilled people to the task of resolving individual credit situations," while further strengthening "underwriting criteria."  Colonial Current Report, Form 8-K, Apr. 21, 2008, at Ex. 99.1.  Lowder

stated that Colonial was taking an "opportunistic approach to the current market cycle," by taking "advantage of the disruption in the mortgage banking market." *Id.*

83.     The Bank's losses were primarily concentrated in the hardest hit regions of the country—most notably in Florida, where the Bank had more than half its assets. Crystal Jarvis, *It's Official: Colonial BancGroup Fails*, Birmingham Bus. J., Aug. 14, 2009. Florida was "among the worst hit in the [mortgage] crisis as real estate prices in the state tumbled and defaults soared amidst the housing meltdown." Geoffrey Rogow, *West Coast Bancorp, Wintrust Slide as Small Banks Experience Big-Bank Woes*, Wall St. J., Apr. 22, 2008.

84.     On April 21, 2008, Colonial announced that it would raise almost $300 million in common stock in an effort to bolster its capital position. Colonial Current Report, Form 8-K, Apr. 21, 2008, at Ex. 99.1. Nonetheless, Fitch Ratings affirmed the Company's negative outlook, citing ongoing concerns about the Company's "credit quality and its significant exposure to troubled markets such as Florida," and its "asset quality deterioration . . . in its residential real estate construction portfolio." *Fitch Affirms The Colonial BancGroup Inc.'s Ratings; Outlook Remains Negative*, Business Wire, Apr. 21, 2008, at http://findarticles.com/p/articles/mi_m0EIN/ is_2008_April_21/ai_n25338265/.

85.     As Colonial continued to rapidly grow its loan portfolio throughout 2008, its primary regulator, the Office of the Comptroller of the Currency (the "OCC"), became increasingly concerned. Crystal Jarvis, *Colonial: Aggressive Strategy Fueled Company's Growth – and Its Demise*, Birmingham Bus. J., Aug. 21, 2009. "This was likely the reason why the bank switched regulators and returned to the state of Alabama Banking Department" and the FDIC in June 2008. *Id.* At the time, Colonial insisted that it changed charters to "focus more on customers and communities." *Colonial BancGroup Switches to State Charter*, Reuters, June 10,

28

2008.  Nonetheless, the move "was widely interpreted as a move to get federal officials off Colonial's back."  Dan Fitzpatrick, David Enrich, & Damian Paletta, *Moving the Market: Colonial Nears Deal to Convert to Thrift*, Wall St. J., Mar. 31, 2009.

86.     On July 16, 2008, second-quarter 2008 earnings "surprised the markets with a quarterly loss," mainly attributed to increased provisions for loan losses.  Adheesha Sarkar, *Colonial BancGroup Posts Surprise Q2 Loss*, Reuters, July 16, 2008.  Lowder again downplayed the increasing deterioration in Colonial's loan portfolios, stating in its press release that "[t]otal charge-offs in the coming quarters will not be any worse than this quarter."  *Id*.

87.     In October, the Company once again reported a loss, announcing a $71 million net loss for the third quarter.  Colonial Current Report, Form 8-K, Oct. 22, 2008, at Ex. 99.1.  The Company also suspended its quarterly dividend.  *Id*.  Colonial's stock price plunged as much as 54%.

88.     On November 13, 2008, Colonial applied for Troubled Asset Relief Program ("TARP") funds provided by the Emergency Economic Stabilization Act of 2008 that was enacted in response to the extreme financial market panic.  Colonial's shares that day had fallen to a low of $1.40, continuing its downward trend since 2007.

89.     On December 2, 2008, the Company announced that it had received preliminary approval to receive $550 million in TARP funding.  Colonial Current Report, Form 8-K, Dec. 2, 2008, at Ex. 99.1.  Defendant Lowder explained that the TARP funds would "enhance [the Company's] capital cushion," and enable it to provide "additional lending activity."  *Id.*  On this news, Colonial's share price rose to just over $3 a share.

90.     Colonial's troubles were not over, however.  Despite the imminent cash infusion from the TARP, an analyst at Morgan Stanley stated that Colonial was "at the most risk among

U.S. mid-cap banks from its exposure to states with high levels of delinquent loans."  Anurag Kotoky, *Avoid Banks With Exposure in Problem States*, Reuters, Dec. 8, 2008.

91.    And on January 27, 2009, after reporting $825 million in net losses for the fourth quarter of 2008, the Company revealed that it was required to raise $300 million in capital as a pre-condition to receiving TARP funding.  Colonial Current Report, Form 8-K, Jan. 27, 2009, at Ex. 99.1.  This came "as a big surprise to investors, adding to the negative sentiment toward the stock."  Sweta Singh, *Colonial Says No TARP Funds Without Capital Raise, Shares Slump*, Reuters, Jan. 28, 2009.  Colonial shares plummeted 20%.  *Id.*

92.    On March 3, 2009, Colonial disclosed in its Annual Report that it had "entered into informal memorandums of understanding with regulators, agreeing to take capital improvement steps," or else "the banking agencies [would] have the authority to place the institution into receivership."  Bhattiprolu Murti, *Colonial BancGroup in Informal MOU With Regulators*, Dow Jones Newswires, Mar. 3, 2009.

93.    During that time, Colonial's shares were "trading at a fraction" of what its financial statements said the Company's was worth, "largely reflect[ing] the risk that the bank might not meet either the TARP or MoU conditions."  Dan Fitzpatrick, David Enrich & Damian Paletta, *Moving the Market: Colonial Nears Deal to Convert to Thrift*, Wall St. J., Mar. 31, 2009. With Colonial's shares "down 91 percent from a year ago," the market was not convinced of the Company's ability to revive itself.  *Id.*

94.    On May 28, 2009, the Company announced that Defendant Lowder, the Chairman, Director, CEO and President, and founder of the Company, would retire.  Colonial Current Report, Form 8-K, May 28, 2009, at Ex. 99.1.

95.     By the end of June, the FDIC, Federal Reserve, and State of Alabama had each issued a cease and desist order to Colonial because of the Bank's inability to maintain certain capital levels.  Colonial Current Report, Form 8-K, July 31, 2009, at Ex. 99.1.

96.     On July 31, 2009, Colonial reported a net loss of $606 million for the second quarter.  *Id*.  Additionally, the Company revealed that nonperforming assets had increased to $1.7 billion, constituting 12.29% of net loans.  *Id*.  Not surprisingly, the Company's management "concluded that there [was] substantial doubt about Colonial's ability to continue as a going concern."  *Id*.  Despite this dire determination, the Plan fiduciaries continued to offer Company stock as a Plan investment option.

97.     Furthermore, Colonial's agreement with investors, led by Taylor, Bean & Whitaker Mortgage Corp., for a $300 million rescue to allow the Company to become eligible for TARP funds fell through in July 2009.  *Id*.

98.     On this news, the Company's stock price closed at $0.61.

99.     On August 3, 2009, the Federal Bureau of Investigation, Department of Housing and Urban Development, and special inspector general for the TARP raided Colonial's mortgage warehouse lending division.  James R. Hagerty & Lingling Wei, *Taylor Bean Suspended from Making FHA Loans*, Wall St. J., Aug. 5, 2009.

100.    On August 5, 2009, the Alabama State Banking Department notified the Bank that the Alabama State Banking Board was meeting to determine whether to close the Bank and appoint the FDIC as receiver.  Cosby Woodruff, *Colonial BancGroup Faces State, Federal Investigations*, Montgomery Advertiser, Aug. 8, 2009, http://www.montgomeryadvertiser.com/article/20090808/BUSINESS/908080341.

101.    The next day, the Company learned it was "the target of a federal criminal investigation relating to the Company's mortgage warehouse lending division and related alleged accounting irregularities."  Colonial Current Report, Form 8-K, Aug. 7, 2009, at Ex. 99.1.  The FBI explained that "the alleged accounting irregularities relate to more than one year's audited financial statements and regulatory financial reporting."  *Id*.

102.    Colonial also "received subpoenas from the Securities and Exchange Commission related to the capital it set aside for soured loans and its efforts to participate in the [TARP] and from the special inspector general for the TARP program."  Matthias Rieker & Tess Stynes, *Colonial is Target of U.S. Criminal Inquiry*, Wall St. J., Aug. 8, 2009.

103.    One week later, on August 14, 2009, the Alabama State Banking Department closed the Bank, named the FDIC as receiver, "after an agreement was reached to have BB&T Corp. acquire most of its assets and all of its deposits."  Michael Crittenden, *Colonial BancGroup Shut Down by Regulators, Sold to BB&T*, Dow Jones News, Aug. 14, 2009.

104.    The Bank is the sixth-largest bank to fail in U.S. history.

105.    After acquiring the assets of the Bank, BB&T was forced to mark down "Colonial loans and real-estate collateral by 37%, a number that reflects a large amount of estimated losses. The biggest mark is on construction loans; BB&T is cutting their value by 67%"  Peter Eavis, *Colonial Bank Marks a New Low for Loans*, Wall St. J., Aug. 19, 2009.

106.    This drastic cut confirms that Colonial was inflating the value of its loan portfolio in its regulatory filings in violation of GAAP.

107.    BB&T's chief financial officer, Daryl Bible, noted that "[w]hen we looked at Colonial's portfolio versus ours, we saw a lot of borrowers we turned away."  *Id*.

32

**B.** **Defendants Knew or Should Have Known that Colonial Stock Was an Imprudent Investment.**

108.    Given the facts described above, it is clear that since the beginning of the Class Period, the Company's stock was an imprudent investment for the Plan because, among other things, the Bank: (1) engaged in high-risk loan origination, mortgage warehouse lending, and investment practices, which are the subject of criminal investigations; (2) lacked adequate internal and financial controls; (3) grossly mismanaged risk and liquidity; (4) engaged in improper accounting practices; and (5) did not adequately reserve for loan losses, all of which created dire financial circumstances.  Furthermore, Defendants failed to acknowledge, manage, and accurately disclose the risks associated with the Bank's mortgage loan origination, mortgage warehouse lending, and investment practices.  And Defendants issued false, misleading, and incomplete statements regarding its net income and financial results, which led to the artificial inflation of the Company's stock price.

109.    Defendants had substantial warnings of the cooling housing market, improper underwriting, and impending mortgage crisis.  Because Colonial's earnings were completely dependent on the Bank's mortgage-related business, these warnings should have triggered an investigation by the Plan fiduciaries into the prudence of the Plan's investment in Company stock.

**1.** **Published Warnings Place Plan Fiduciaries on Notice of Need to Investigate Risks at Colonial.**

110.    In late 2004 and early 2005, industry watchdogs began expressing growing fears that relaxed lending practices had increased "risks for borrowers and lenders in the overheated housing markets."  Simon, *Mortgage Lenders Loosen Standards*, *supra*.

111.    Indeed, trouble in the housing market emerged in 2005 when home values began to decline and the Federal Reserve instituted a series of interest rate hikes that caused interest

rates on variable rate loans, including mortgage loans, to rise. In response, "bank regulators issued their first-ever guidelines for credit-risk management for home-equity lending" in May 2005. *Id.*

112.    On July 26, 2005, the *Wall Street Journal* warned that "[m]ortgage lenders are continuing to loosen their standards, despite growing fears that relaxed lending practices could increase risks for borrowers and lenders in overheated housing markets." *Id.*

113.    In response to the increasing risks inherent in nontraditional lending, the Federal Reserve and the other banking agencies the "Interagency Guidance on Nontraditional Mortgage Product Risks," which sent a warning to the marketplace that bank regulators were concerned about the lessened underwriting standards and general lax risk management practices of some mortgage lenders. *See* Office of the Comptroller of the Currency Board of Governors of the Federal Reserve System, *Interagency Guidance on Nontraditional Mortgage Product Risks*, Sept. 29, 2006, http://www.federalreserve.gov/BoardDocs/SRLetters/2006/ SR0615a2.pdf.

114.    On December 20, 2006, the Center for Responsible Lending issued a report predicting the worst foreclosure crisis in the modern mortgage market. Ron Nixon, *Study Predicts Foreclosure for 1 In 5 Subprime Loans*, N.Y. Times, Dec. 20, 2006, at C1. Shortly thereafter, several major mortgage lenders disclosed extraordinary rates of loan defaults, triggering inquiries from the SEC and FDIC, and resulting in several bankruptcy filings. *Id.*

115.    On August 31, 2007, former President Bush announced a limited bailout of U.S. homeowners unable to pay the rising costs of their debts. Steven R. Weisman, *Bush Plans a Limited Intervention on Mortgages*, N.Y. Times, Sept. 1, 2007, at C1.

##### 2.    Defendants Knew that the Company was at Risk and Company Stock was Imprudent Because of the Company's Improper Business Practices.

116.    Due to their positions within the Company, Defendants knew or should have known that Colonial stock was an unduly risky investment option.  They knew or should have known that the Company was extending below-standard loans to risky borrowers that were at a high risk of default, the Company lacked adequate internal controls, and statements regarding the Company's net income and financial results were misleading and inaccurate.  While discovery may shed additional light on the extent to which Defendants were aware of and ignored the Company's serious mismanagement and improper practices, certainly Defendants Beville and Lowder, as the current and former CEOs, respectively, and the Benefits Committee Defendants cannot genuinely contend that they were unaware of this conduct.

117.    In light of the published warnings described above, Defendants also knew that the housing market was cooling and the mortgage markets were unstable due to decreased demand and increased rates of default.  To the extent that some of the Defendants did not have actual knowledge of the degree to which Colonial stock was inflated due to the Company's undisclosed exposure to losses from the Bank's loan portfolio, securities portfolio, and mortgage warehouse lending, these published warnings put those Defendants on notice and should have caused them to investigate the risks posed by Colonial stock.  However, they conducted no such investigation.

118.    Defendants had available to them several options for satisfying their fiduciary duties, including: (1) making appropriate public disclosures, as necessary; (2) divesting the Plan of Colonial stock; (3) discontinuing further investment in Colonial stock under the Plan; (4) consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan; and/or (5) resigning as fiduciaries of the Plan to the extent that as a result of their employment by or association with Colonial they were unable to

35

loyally serve the Plan and its participants in connection with the Plan's acquisition and holding of Colonial stock

119.    In the end, when the severity of the circumstances came to light, the Plan suffered significant losses, all or some of which could have been avoided had the Plan's fiduciaries acted prudently and loyally to protect the interests of Plan participants, as required by ERISA

C.    **Despite Knowledge of the Bank's Improper Business Practices and Colonial's Inadequately Disclosed Stock Risk, Defendants Permitted the Purchase of Colonial Stock.**

120.    Colonial's seemingly strong financial picture in recent years was based on its strategy to collect deposits from customers and use that money to originate construction, land, and development loans in many of the overheated parts of the real estate boom.  It also invested in mortgage securities and funded mortgage originators through its wholesale lending facility. As the housing market faltered, so too did the Company.

121.    To assuage fears of the growing problems in the housing market, Defendants repeatedly made false statements regarding its financial condition and false assurances to Plan participants and the public regarding the sufficiency of its risk-management processes and reserves for losses.  These false statements caused the price of Colonial stock to be artificially inflated during the Class Period.

122.    The positions of the Benefits Committee Defendants, as well as Defendant Lowder's and subsequently Defendant Beville's position as CEO indicate that they had access to, and should have known about, the adverse undisclosed information about the Company's business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plan, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at

36

management and Board meetings, and receipt of reports and other information provided in connection with these meetings. Because of their access to this information, the Benefits Committee Defendants and Defendants Lowder and Beville knew or should have known that Colonial's common stock was an imprudent investment for the Plan's assets during the Class Period.

123.    In light of the steady drumbeat of published warnings of the risks inherent in the residential real estate bubble, as well as their own knowledge of the Company's financial condition, the remaining Defendants should have conducted an investigation of the risks posed by Colonial stock during the Class Period. No prudent fiduciary would allow employees to invest in a company facing (and hiding) the tremendous risks Colonial took on during the Class Period.

124.    Nonetheless, the Plan's fiduciaries continued to offer Colonial stock as an investment option and maintained Colonial stock in the Plan. A prudent fiduciary facing similar circumstances would not have stood idly by as the Plan's assets inevitably decreased in value.

**D.    Defendants Failed to Provide the Plan's Participants, Beneficiaries, and their Co-Fiduciaries with Complete and Accurate Information about the True Risks of Investment in Colonial Stock in the Plan.**

125.    Despite Defendants' knowledge or what should have been their knowledge of the Bank's risky business practices during the Class Period, they presented a positive outlook regarding Colonial stock as an investment for the Plan's assets. Management, including Defendant Lowder, publicized strong Company performance and stock benefits.

126.    ERISA mandates that plan fiduciaries have a duty of loyalty to the plan, its participants, and co-fiduciaries, which includes the duty to speak truthfully to the plan, its participants, and co-fiduciaries when communicating with them. A fiduciary's duty of loyalty under ERISA includes an obligation not to materially mislead or knowingly allow others to

materially mislead plan participants, beneficiaries, or co-fiduciaries. *Hill v. BellSouth Corp.*, 313 F. Supp. 2d 1361, 1369 (N.D. Ga. 2004) (citing *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996)).

127.    During the Class Period, on information and belief, Defendants regularly made direct and indirect communications to Plan participants.  These communications also included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents, in which Defendants failed to disclose that Company stock was an imprudent retirement investment, and which were incorporated by reference in Plan-related documents.  On information and belief, The Company regularly communicated with employees, including participants in the Plan, about the performance, future financial and business prospects of the Company, and Company stock which was the single largest asset of the Plan.

128.    Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants—well-recognized in the 401(k) literature and the trade press—concerning investment in company stock, including that:

> (1)    out of loyalty, employees tend to invest in company stock;
>
> (2)    employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;
>
> (3)    employees tend not to change their investment option allocations in the plan once made;
>
> (4)    lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and
>
> (5)    even for risk-tolerant investors, the risks inherent in company stock are not commensurate with it rewards.

Bridgitte C. Mandrian & Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior*, 116 Q. J. Econ. 4, 1149 (2001), http://mitpress.mit.edu/

journals/pdf/qjec_116_04_1149_0.pdf; *see also* Nellie Liang & Scott Weisbenner, *Investor Behavior and the Purchase Of Company Stock in 401(k) Plans the Importance of Plan Design, Board of Governors for the Federal Reserve System Finance and Economics Discussion Series*, No. 2002 36 (2002), http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf.

129.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the high concentration of the Plan's funds in Company stock during the Class Period, Defendants failed to take any meaningful ameliorative action to protect the Plan and its participants from the heavy investment in Colonial stock.

130.    In particular, Defendants failed to provide participants, and the market as a whole, with complete and accurate information regarding the true financial condition of the Company, which was affected by, among other things, the Bank's: (1) highly risky loan origination, mortgage warehouse lending, and investment practices; (2) lack of adequate internal and financial controls; (3) mismanagement of risk and liquidity; (4) improper accounting practices; and (5) inadequate reserves for loan losses, all of which created dire financial circumstances.

131.    As a result, participants in the Plan could not appreciate the true risks presented by investments in Company stock and, therefore, could not make informed decisions regarding their Plan investments in Company stock.

132.    Additionally, the Benefits Committee Defendants and Defendants Beville and Lowder knew all or a portion of the truth about the Company's financial condition and in particular about the risks posed to the Company by the Bank's exposure to loans originated under lowered standards, as detailed previously.  On information and belief, the Benefits Committee Defendants and Defendants Beville and Lowder and any other Defendant with

knowledge of some or all of the risks posed by the Plan's investment in Company stock failed to disclose this information to their co-fiduciaries.

**E.      Defendants Suffered from Conflicts of Interest.**

133.    As ERISA fiduciaries, Defendants were required to manage the Plan's investments, including the investment in Colonial stock, solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and their beneficiaries.  This duty of loyalty requires fiduciaries to avoid conflicts of interest and to resolve them promptly when they occur.

134.    Conflicts of interest arise when a company that invests plan assets in company stock founders.  As the situation deteriorates, plan fiduciaries are torn between their duties as officers and directors for the company on the one hand, and to the plan and plan participants on the other.  As courts have made clear, "[w]hen a fiduciary has dual loyalties, the prudent person standard requires that he make a careful and impartial investigation of all investment decisions." *Martin v. Feilen*, 965 F.2d 660, 670 (8th Cir.1992) (citation omitted).  Fiduciaries must avoid "placing themselves in a position where their acts as officers or directors of the corporation will prevent their functioning with the complete loyalty to participants demanded of them as trustees of a pension plan."  *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982).

135.    Because the compensation of several Defendants was significantly tied to the price of Colonial stock, Defendants had an incentive to keep the Plan's assets invested in Colonial stock on a regular, ongoing basis.  Elimination of Company stock as an investment option for the Plan would have reduced the overall market demand for Colonial stock and sent a negative signal to Wall Street analysts and the market overall.  Both results would have adversely affected the price of Colonial stock, resulting in lower compensation for the Defendants.

136.    Some Defendants may have had no choice in tying their compensation to Colonial stock (because compensation decisions were out of their hands), but Defendants did have the choice of whether to keep the Plan's participants' and beneficiaries' retirement savings invested in Colonial stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

137.    Finally, any signal to the market that the Company was not a sound, long term investment, such as the Plan's divestiture of Colonial stock, would have called into question the Defendants' job performance as corporate officers.  Rather than have anyone question their soundness as leaders of Colonial, Defendants chose to remain silent and let the Plan continue to hold and acquire Colonial stock.

138.    These conflicts of interest put the Defendants in the position of having to choose between their own interests as directors, executives, and stockholders, and the interests of the Plan's participants and beneficiaries, in whose interests the Defendants were obligated to loyally serve with an "eye single."

139.    Yet, Defendants did nothing to protect the Plan and the Plan's participants from the inevitable losses the Plan would suffer.

140.    While the above Defendants protected themselves, they stood idly by as the Plan lost millions of dollars because of its investment in Colonial stock.

## IX.    THE RELEVANT LAW

141.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

142.    An individual may be a fiduciary for ERISA purposes either because the plan documents explicitly describe fiduciary responsibilities or because that person functions as a

41

fiduciary. *See* U.S.C. § 1002(21)(A); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993); *Concha v. London*, 62 F.3d 1493 (9th Cir. 1995).

143.     When fiduciaries put the interests of the company or their own interests ahead of the interests of plan participants, they violate ERISA.  A fiduciary may, therefore, be personally liable to plan participants for breaching the responsibilities, obligations, or duties imposed under the plan and must restore any losses to the plan with any profits the fiduciary made through use of plan assets.  ERISA § 409(a), 29 U.S.C. § 1109(a).

144.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from fiduciaries, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

145.     ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provide, in pertinent part:

> A fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

146.     These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose, and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

147.     A fiduciary breaches the duty of loyalty when the fiduciary withholds information that the fiduciary knows or should know a participant would need to make an informed decision. Therefore, the duty of loyalty includes:  (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a

duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

148.    A fiduciary must avoid conflicts of interest and resolve them promptly when they do occur.  As such, a plan fiduciary must always administer a plan with an exclusive purpose or "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.  *Bierwirth*, 680 F.2d at 271.

149.    A plan fiduciary is also responsible for the investment and monitoring of plan investments, ensuring that only prudent investments are offered as plan options, and monitoring such investments to ensure that they remain prudent and suitable for the plan.  *In re ADC Telecomm, ERISA Litig.*, No. 03-2989, 2004 U.S. Dist. LEXIS 14383 (D. Minn. July 26, 2004). This includes the duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan to ensure that each investment is a suitable option for the plan.

150.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2)    if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

151.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility. Because ERISA permits the fractionalization of a fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given decision, such as the role of company stock in a plan. In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries. The result would be a setting in which a major fiduciary breach could occur, but the responsible party could not easily be identified. Co-fiduciary liability obviates this. Even if a fiduciary did not participate in a breach, if he knows of a breach, he must take steps to remedy it.

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . . [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor. The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co-fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

152.    Plaintiff brings this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## X.    PLAINTIFF IS NOT OBLIGATED TO EXHAUST ADMINISTRATIVE REMEDIES

### A.    While Claims for Benefits and Other Contractual Matters Under ERISA Are Subject to an Exhaustion Requirement, Claims for Breach of Fiduciary Duty Are Not

153.    Plaintiff claims breach of fiduciary duty under ERISA §§ 404 and 405, 29 U.S.C. §§ 1104 & 1105, for which she is entitled to damages under ERISA § 409, 29 U.S.C. § 1109, and may bring a civil action under ERISA § 502(a)(2) and (a)(3), 29 U.S.C. § 1132(a)(2) & (a)(3).

44

ERISA claims based on statutory rights, such as ERISA §§ 404 and 405, 29 U.S.C. §§ 1104 & 1105, are distinguished from claims based on "benefits due" or other contractual rights under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

154.    An ERISA participant may "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan" under ERISA § 502(a)(1), 29 U.S.C. 1132(a)(1).  Subject to some exceptions, a plaintiff wanting to recover benefits due or enforce rights regarding plan benefits must exhaust available administrative remedies before suing under ERISA § 502(a)(1).  Thus, all circuits have uniformly required plaintiffs to exhaust administrative remedies before brining suit in federal court to obtain benefits.

155.    However, "no provision of ERISA expressly or implicitly requires exhaustion of administrative remedies before a participant may bring a fiduciary breach claim in federal court under ERISA section 502(a)(2) for losses to the plan."  *See* Brief of the Secretary of Labor as Amicus Curie, *Spivey v. Southern Company, et. al.*, No. 06-12642 (6th Cir. July 14, 2006) (attached hereto as Exhibit A) at 9-19 (Exhibit A at 28-38) (emphasis in original).

156.    Furthermore, the DOL, the agency responsible for enforcing ERISA, has advised that:

> Notably missing from sections 502(a)(2) and 409 is any requirement that the enumerated parties exhaust internal review procedures before bringing suit to remedy fiduciary breaches that harm the plan.  Nor is there any other provision in ERISA indicating that Congress intended for an exhaustion requirement to apply in those circumstances.

*Id*. at 10-11 (Exhibit A at 29-30).

157.    Simply put, this is not an ERISA § 502(a)(1) case.  Plaintiff is not seeking to recover benefits due or enforce other rights specific to herself.  Instead, Plaintiff is petitioning this court to remedy a breach of fiduciary duty owed by Defendants to the Plan.  Accordingly, it

45

is neither necessary nor useful for Plaintiff to exhaust any purported administrative remedies in this case.

**B.     Exhaustion of Administrative Remedies for Plaintiff's Multi-Million Dollar Breach of Fiduciary Claims Would Have Been Futile.**

**1.     The Plan Provides No Procedure for Fiduciary Claims.**

158.    While the SPD provides administrative procedures for claims for benefits, the SPD provides no administrative procedure for "fiduciary claims." Thus, as the SPD provides no administrative procedure by which Plaintiff may make a claim for fiduciary breach under ERISA § 502(a)(2) and (3), any demand made by Plaintiff for remedy of such claims would be futile.

**2.     The Administrative Committee, and Subsequently the Benefits Committee, as the Plan Administrator Cannot Provide the Statutory Relief Sought.**

159.    The futility is also evident in the nature of the relief sought by Plaintiff, the administrative process itself, and the conduct of Defendants. Under ERISA § 502(a)(2), 29 U.S.C. 1132(a)(2), Plaintiff seeks to enforce, pursuant to ERISA § 409, 29 U.S.C. § 1109, Defendants' "personal[] liabil[ity] to make good to [a] plan any losses to the plan resulting from [the breach of fiduciary duty]." Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiff can "enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or . . . obtain other appropriate equitable relief ."

160.    Plaintiff alleges that Defendants' breaches of fiduciary duty have caused the Plan to lose millions of dollars. Given the extent of the Defendants' liability, it is certain that the relief Plaintiff seeks will not be provided through the Plan's administrative process. Moreover, neither the Administrative Committee nor the Benefits Committee is going to order itself or any of the other Defendants to pay millions of dollars to the Plan or seek a declaratory judgment to this effect, so any appeal to it would be futile.

161.    Indeed, the procedures set forth in the Plan do not empower the Administrative Committee or the Benefits Committee, or any of the other fiduciaries who are involved in the administrative claims process to order other Plan fiduciaries to pay for the losses they have caused the Plan to incur.  Such relief only can be obtained from a federal court, and it would be futile to seek that relief from the Administrative Committee, the Benefits Committee, or any of the other Defendants.

162.    In addition, even if the Administrative Committee or the Benefits Committee were to order the monetary relief sought, the Defendants' assets are inadequate to satisfy such an order.  Plaintiff's attempt to obtain any such order would be futile.

163.    Nonetheless, in an abundance of caution and despite Plaintiff's well-founded belief that no exhaustion is required prior to bringing her claims under ERISA § 502(a)(2) and (3), Plaintiff submitted an administrative demand to the Administrative Committee prior to her submission of the Complaint.  *See* Letter from Derek Loeser to Administrative Committee, September 11, 2009 (attached hereto as Exhibit B).  Should this Court find that Plaintiff is required to exhaust her administrative remedies under the Plan, Plaintiff reserves the right to seek permission of the Court to stay this action pending the resolution of their administrative demand and amend her Complaint accordingly.

## XI.    CAUSES OF ACTION

**A.    Count I: Failure to Prudently and Loyally Manage the Plan and Assets of the Plan.**

164.    Plaintiff incorporates by this reference the paragraphs above.

165.    This Count alleges fiduciary breach against the following Defendants: the Investment Committee Defendants and Benefits Committee Defendants (the "Prudence Defendants").

166.    The Plan is governed by the provisions of ERISA, 29 U.S.C. §§ 1001, *et. seq.*, and Plaintiff is a  participant of the Plan.

167.    Each of the Prudence Defendants, on information and belief, were *de facto* fiduciaries within the meaning of § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

168.    Each of the Prudence Defendants was also a co-fiduciary of the other Defendants, under ERISA § 405, 29 U.S.C. § 1105, with respect to the Plan and its participants.  As co-fiduciaries, each of the Defendants is liable for the others' conduct under the terms of ERISA § 405(a), 29 U.S.C. § 1005(a).

169.    As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA.  On information and belief, the Prudence Defendants were directly responsible for, among other things, selecting prudent investment options, eliminating imprudent options, determining how to invest employer contributions to the Plan and directing the Trustee regarding the same, evaluating the merits of the Plan's investments on an ongoing basis, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

170.    Yet, contrary to their duties and obligations under the Plan's documents and ERISA, the Prudence Defendants failed to loyally and prudently manage the assets of the Plan. Specifically, during the Class Period, the Prudence Defendants knew or should have known that Colonial stock no longer was a suitable and appropriate investment for the Plan, but was, instead, a highly speculative and risky investment in light of the Company's fundamental weaknesses. Nonetheless, during the Class Period, the Prudence Defendants continued to offer Colonial stock

as an investment option for participant contributions. They did so despite evidence that the Company was engaged in an improper and highly risky business plan and had ignored industry regulations and warnings, as well as sound business practice in order to extend mortgages which were at high risk of default.

171. The Prudence Defendants were obliged to prudently and loyally manage all of the Plan's assets. However, their duties of prudence and loyalty were especially significant with respect to Company stock because: (1) company stock is a particularly risky and volatile investment, even in the absence of company misconduct; and (2) participants tend to underestimate the likely risk and overestimate the likely return of investment in company stock. In view of this, the Defendants were obliged to have in place a regular, systematic procedure for evaluating the prudence of investment in Company stock.

172. The Prudence Defendants had no such procedure. Moreover, they failed to conduct an appropriate investigation of the merits of continued investment in Colonial stock even in light of the losses, the Bank's highly risky and inappropriate practices, and the particular dangers that these practices posed to the Plan. Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in Colonial stock under these circumstances.

173. The Prudence Defendants' decisions respecting the Plan's investment in Colonial stock described above, under the circumstances alleged herein, abused their discretion as ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would have made different investment decisions. Specifically, based on the above, a prudent fiduciary could not have reasonably believed that further and continued investment of the Plan's contributions and

assets in Colonial stock was in keeping with the Plan settlor's expectations of how a prudent fiduciary would operate.

174.     The Prudence Defendants were obligated to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.  ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

175.     According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if:  (1) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (2) he has acted accordingly.

176.     Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

> (1) a determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action; and
>
> (2) consideration of the following factors as they relate to such portion of the portfolio:
>
>> a.  the composition of the portfolio with regard to diversification;
>>
>> b.  the liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

      c.  the projected return of the portfolio relative to the funding objectives of the plan.

177.    Given the conduct of the Company as described above, the Prudence Defendants could not possibly have acted prudently when they continued to invest the Plan's assets in Colonial stock because, among other reasons, the Prudence Defendants knew of and/or failed to investigate the improper business practices of the Bank. These improper business practices included, among things, that the Bank: (1) engaged in high-risk loan origination, mortgage warehouse lending, and investment practices; (2) lacked adequate internal and financial controls; (3) mismanaged risk and liquidity; (4) engaged in improper accounting practices; and (5) did not adequately reserve for loan losses, all of which created dire financial circumstances. Furthermore, Defendants failed to acknowledge, manage, and accurately disclose the risks associated with the Bank's mortgage loan origination, mortgage warehouse lending, and investment practices. And Defendants issued false, misleading, and incomplete statements regarding its net income and financial results, which led to the artificial inflation of the Company's stock price.

178.    As such, the risk associated with the investment in Colonial stock during the Class Period was far above the normal, acceptable risk associated with investment in company stock. Yet, Plan participants were unaware of this risk. The Prudence Defendants knew participants were unaware of the risk—as was the market generally—because the Prudence Defendants never disclosed it.

179.    Thus, given this inequity, the Prudence Defendants had a duty to avoid permitting the Plan or any participant to invest Plan assets in Colonial stock.

51

180.     Further, knowing that the Colonial common stock investment in the Plan was not a diversified portfolio, the Prudence Defendants had a heightened responsibility to divest the Plan of Company stock if it became or remained imprudent.

181.     The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.  Fiduciaries laboring under such conflicts, must, in order to comply with the duty of loyalty, make special efforts to assure that their decision making process is untainted by the conflict and made in a disinterested fashion, typically by seeking independent financial and legal advice obtained only on behalf of the plan.

182.     The Prudence Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by: (1) failing to engage independent advisors who could make independent judgments concerning the Plan's investment in Colonial stock; (2) failing to notify appropriate federal agencies, including the DOL, of the facts and circumstances that made Colonial stock an unsuitable investment for the Plan; (3) failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; (4) failing to disregard the impact of their duty to avoid conflicts of interest on their own compensation; and (5) placing their own improper interests above the interests of the participants with respect to the Plan's investment in Colonial stock.

183.     Moreover, a fiduciary's duties of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives

that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan, to do so.

184.    The Prudence Defendants breached this duty by: (1) continuing to offer Colonial stock as an investment option for participants of the Plan; (2) allowing participants to invest Plan assets in Colonial stock rather than in cash or other short-term investment options; and (3) engaging in this course of conduct when the Prudence Defendants knew or should have known that Colonial stock no longer was a prudent investment for participants' retirement savings.

185.    As a consequence of the Prudence Defendants' breaches of fiduciary duty alleged in this Count, the Plan suffered tremendous losses.  If the Prudence Defendants had discharged their fiduciary duties to prudently invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

186.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Prudence Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**B.    Count II: Failure to Monitor Fiduciaries.**

187.    Plaintiff incorporates by this reference the allegations above.

188.    This Count alleges fiduciary breach against the following Defendants: the Director Defendants (the "Monitoring Defendants").

189.    As alleged above, during the Class Period the Monitoring Defendants were *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

190.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries, including monitoring (1) the Investment Committee Defendants, (2) the Administrative Committee Defendants; and (3) the Benefits Committee Defendants.

191.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

192.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

193.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

194.    On information and belief, the Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (1) failing, at least with respect to the Plan's investment in Company stock, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Company stock; (2) failing to ensure that the monitored fiduciaries appreciated the true extent of the Bank's highly risky and inappropriate business and accounting practices, and the likely impact of such practices on the value of the Plan's investment in Colonial stock; (3) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets; and (4) failing to remove appointees whose performance was inadequate in that they continued to make and maintain investments in Colonial stock despite their knowledge of practices that rendered Colonial stock an imprudent investment during the Class Period for participants' retirement savings in the Plan, and who breached their fiduciary duties under ERISA.

195.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the other Class members, lost millions of dollars of retirement savings.

196.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their

breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**C.      Count III: Failure to Provide Complete and Accurate Information to the Plan's Participants and Beneficiaries.**

197.    Plaintiff incorporates by this reference the allegations above.

198.    This Count alleges fiduciary breach against the following Defendants: the Administrative Committee Defendants and Benefits Committee Defendants (the "Communications Defendants").

199.    As previously alleged, the Communications Defendants were both named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) and *de facto* fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

200.    At all relevant times, the scope of the fiduciary responsibility of the Communications Defendants included the communications and material disclosures to the Plan participants and beneficiaries.

201.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the plan with complete and accurate information, and to refrain from providing false information or concealing material information, regarding plan investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the plan.  This duty applies to all of the Plan's investment options, including investment in Colonial stock.

56

202.    Because investments in the Plan were not diversified (*i.e.*, Defendants chose to or allow Plan assets to be invested so heavily in Colonial stock), such investment carried with it an inherently high degree of risk.  This inherent risk made the Communications Defendants' duty to provide complete and accurate information particularly important with respect to Colonial stock.

203.    The Communications Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding the Bank's serious mismanagement and improper business practices and the Company's public misrepresentations, and the consequential artificial inflation of the value of Colonial stock, and, generally, by conveying incomplete information regarding the soundness of Colonial stock and the prudence of investing and holding retirement contributions in Colonial equity.  These failures were particularly devastating to the Plan and its participants because Plan assets were invested in Colonial stock during the Class Period, and when the value of Colonial stock collapsed, the Plan participants' retirement savings plummeted.

204.    The Communications Defendants' omissions clearly were material to participants' ability to exercise informed control over their Plan accounts, as in the absence of the information, participants did not know the true risks presented by the Plan's investment in Colonial stock.

205.    The Communications Defendants' omissions and incomplete statements alleged herein were Plan-wide and uniform in that the Communications Defendants failed to provide complete and accurate information to any of the Plan's participants.

206.    The Communications Defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

207.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investment.

208.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a), 29 U.S.C. § 1109(a), the Communications Defendants in the Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**D.    Count IV: Co-Fiduciary Liability.**

209.    Plaintiff incorporates by this reference the allegations above.

210.    This Count alleges co-fiduciary liability against all Defendants.

211.    As alleged above, during the Class Period Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

212.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  Defendants breached all three provisions.

213.    **Knowledge of a Breach and Failure to Remedy.**  ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.  Each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.  In

particular, they did not communicate their knowledge of the Bank's improper business practices to the other fiduciaries.

214.    Colonial and the Bank, through their officers and employees, were unable to meet their business goals, engaged in highly risky and inappropriate business practices, withheld material information from the market, and profited from such practices.  Because Defendants knew of the Company's failures and inappropriate business practices, they also knew that Defendants were breaching their duties by continuing to invest the Plan's assets in Company stock.  Yet, they failed to undertake any effort to remedy these breaches.  Instead, they compounded them by downplaying the significance of Colonial's failed and inappropriate business practices, and obfuscating the risk that the practices posed to the Company, and, thus, to the Plan.

215.    **Knowing Participation in a Breach.**  ERISA § 405(a)(1), 29 U.S.C. § 1105(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach.  The Monitoring Defendants knowingly participated in the breaches of Defendants because, as alleged above, they had actual knowledge of the facts that rendered Colonial stock an imprudent retirement investment and yet, ignoring their oversight responsibilities, permitted Defendants to breach their duties.

216.    **Enabling a Breach.**  ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

217.    The Monitoring Defendants' failure to monitor Defendants, particularly the Investment Committee Defendants, Administrative Committee Defendants, and Benefits Committee Defendants, enabled those Defendants to breach their duties.

218.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost millions of dollars of retirement savings.

219.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## XII.    CAUSATION

220.    The Plan suffered millions of dollars in losses because substantial assets of the Plan were imprudently invested or allowed to be invested by Defendants in Colonial stock during the Class Period, in breach of Defendants' fiduciary duties.

221.    Defendants are liable for the Plan's losses in this case because the Plan's investment in Colonial stock was the result of Defendants' decision to imprudently maintain the assets of the Plan in Colonial stock.  Thus, Defendants are liable for these losses because they failed to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process.

222.    Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating Colonial stock as an investment alternative when it became imprudent, and divesting the Plan of Colonial stock when maintaining such an investment became imprudent, the Plan would have avoided some or all of the losses that they, and indirectly, the participants suffered.

## XIII.    REMEDY FOR BREACHES OF FIDUCIARY DUTY

223.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been invested in Colonial stock during the Class Period.

224.    As a consequence of the Defendants' breaches, the Plan suffered significant losses.

225.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

226.    With respect to calculation of the losses to the Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plan would not have made or maintained their investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plan's assets in the most profitable alternative investment available to them.  Alternatively, losses may be measured not only with reference to the decline in stock price relative to alternative investments, but also by calculating the additional shares of Colonial stock that the Plan would have acquired had the Plan fiduciaries taken appropriate steps to protect the Plan.  The Court should adopt the measure of loss most advantageous to the Plan.  In this way, the remedy restores the Plan's lost value and puts the participants in the position they would have been in if the Plan had been properly administered.

227.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial

based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a);

(2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as

provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (3)

injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C.

1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach; (4) reasonable

attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common

fund doctrine, and other applicable law; (5) taxable costs and interest on these amounts, as

provided by law; and (6) such other legal or equitable relief as may be just and proper.

228.     Under ERISA, each Defendant is jointly and severally liable for the losses

suffered by the Plan in this case.

## XIV.     CLASS ACTION ALLEGATIONS

229.     **Class Definition.**  Plaintiff brings this action as a class action pursuant to Rules

23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of Plaintiff and

the following class of persons similarly situated (the "Class"):

> All persons, other than Defendants, who were participants in or beneficiaries of
> the Plan at any time between April 18, 2007 and the present, and whose accounts
> included investments in Colonial stock.

230.     **Class Period.**  The fiduciaries of the Plan knew or should have known at least by

April 18, 2007 and through the present that the Company's material weaknesses were so

pervasive that Colonial stock could no longer be offered as a prudent investment for retirement

Plan.

231.     **Numerosity.**  The members of the Class are so numerous that joinder of all

members is impracticable.  While the exact number of Class members is unknown to Plaintiff at

this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are,

based on the Plan's Form 5500 for Plan year 2007, approximately 6,300 members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period.

232.    **Commonality.**  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(1)    whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

(2)    whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's participants and beneficiaries;

(3)    whether Defendants violated ERISA; and

(4)    whether the Plan has suffered losses and, if so, what is the proper measure of damages.

233.    **Typicality.**  Plaintiff's claims are typical of the claims of the members of the Class because:  (1) to the extent Plaintiff seeks relief on behalf of the Plan pursuant to ERISA § 502(a)(2), their claims on behalf of the Plan are not only typical to, but identical to a claim under this section brought by any Class member; and (2) to the extent Plaintiff seeks relief under ERISA § 502(a)(3) on behalf of herself for equitable relief, that relief would affect all Class members equally.

234.    **Adequacy.**  Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

235.    **Rule 23(b)(1)(B) Requirements.**  Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which

would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

236.    **Other Rule 23(b) Requirements.**  Class action status is also warranted under the other subsections of Rule 23(b) because: (1) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (2) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (3) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.    An Order requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plan's investment in Colonial stock;

E.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

F.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.      An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

H.      An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants.

DATED October 2, 2009.

___\s\ Derek W. Loeser_____

Derek W. Loeser
dloeser@kellerrohrback.com
Lynn Lincoln Sarko
lsarko@kellerrohrback.com
Erin M. Riley
eriley@kellerrohrback.com
Karin B. Swope
kswope@kellerrohrback.com
Sarah H. Kimberly
skimberly@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA  98101-3052
Telephone:  (206) 623-1900
Facsimile:  (206) 623-3384

*Counsel for Plaintiff*

Daniel Arciniegas
darciniegas@wcqp.com
adrciniegas@wcqp.com
John C. Goldfarb
jcg@wcqp.com
WIGGINS, CHILDS, QUINN & PANTAZIS, LLC
The Kress Building
301 - 19th Street North
Birmingham, AL  35203
Telephone: (205) 314-0500
Facsimile: (205) 254-1500

*Local Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2009, I electronically filed **PLAINTIFF MCKAY AMENDED COMPLAINT FOR BREACHES OF FIDUCIARY DUTY UNDER THE EMPLOYEE RETIREMENT INCOME SECURITY ACT** with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all known counsel of record.

Executed on October 2, 2009, at Seattle, Washington.

      \s\ Derek W. Loeser
      Derek W. Loeser
      Counsel for Plaintiffs